**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TONYJA THOMAS, best friend of | ) | |
| ANTHONY THOMAS, | ) | |
| | ) | 06 C 0757 |
| Plaintiff, | ) | |
| | ) | Judge Kennelly |
| vs. | ) | |
| | ) | Magistrate Judge Valdez |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR SANCTIONS AGAINST DEFENDANT CITY OF CHICAGO**

Pursuant to Fed. R. Civ. P. 37(c)(1), plaintiff Tonyja Thomas ("plaintiff"), best friend of

Anthony Thomas ("Anthony"), has moved this court for sanctions against defendant City of Chicago

for a discovery violation. Specifically, plaintiff asserts that the City thwarted her efforts to identify

the unknown Chicago police officers who allegedly beat Anthony by withholding from her a Chicago

Police Department ("CPD") document known as a Contact Information Card ("contact card") that

would have assisted plaintiff in making these identifications.

Defendant City respectfully requests that this court deny plaintiff's motion for sanctions

against the City. As explained below in greater detail, the attorneys who represent the City in this

lawsuit ("City attorneys")[1] were unaware that a contact card existed – indeed, City attorneys had

---

[1] During the time period at issue the "City attorneys" referenced in this response worked
exclusively in the division formerly known as the "Police Policy Division" in the representation
of the City. The Office of the Corporation Counsel ("City Law Department") serves as legal
counsel for the City of Chicago and its various departments, agencies, and officials. Importantly,
the City Law Department has separate and distinct divisions that handle defense litigation. These
separate divisions exist to address conflicts that may arise in the simultaneous representation of
the interests of the City of Chicago and individuals who may be employed by the City and sued.

every reason to believe that a contact card did *not* exist – and, in fact, made reasonable efforts in good faith to assist plaintiff to identify, through other means, the Chicago police officers who may have been involved in the alleged incident underlying plaintiff's lawsuit. Moreover, any delay in the litigation attributable to Anthony's participation in photo arrays arranged by the City attorneys should not be considered by this court in assessing total delay attributable to the production of the contact card by counsel for the individual defendants named in the First Amended Complaint, as the contact card  has provided Anthony with the name of only one officer.  Accordingly, Anthony's participation in the viewing of photo arrays arranged by the City attorneys in order to identify all five of the police officers who allegedly engaged in the misconduct described in plaintiff's complaint was still necessary.  Thus, despite plaintiff's claims to the contrary, she has suffered no prejudice from any delay in this litigation caused by the timing of the production of the contact card.  For these reasons, this court should deny plaintiff's motion.

## Background

On February 9, 2006, plaintiff, on behalf of her son, filed a five-count complaint against the City of Chicago and five unknown officers.[2]  Plaintiff's lawsuit arose from an incident that allegedly occurred on January 26, 2006, in which Anthony allegedly was beaten after he was detained by the five unknown defendant officers as he attempted to flee a street fight near Marshall High School.

---

Thus, in this lawsuit, the City attorneys represent defendant City of Chicago, and attorneys from the Individual Defense Litigation Division ("IDL") represent the named individual defendant officers.

[2] Because the City of Chicago was named in the lawsuit, City attorneys were assigned to the case.  Importantly, during the time frame at issue in this case, it was the practice of the City Law Department to provide a copy of any lawsuit with allegations of police misconduct, including those naming "unknown officers," initially to IDL, rather than to the City attorneys.

In her complaint, plaintiff brought federal claims of excessive force and illegal detention against the unknown officers and state law claims of assault and battery and intentional infliction of emotional distress against all defendants.

On the date of the alleged incident, plaintiff filed a complaint with the City's Office of Professional Standards ("OPS"). On January 27, 2006, in an attempt to identify the accused officers, OPS showed photos to Anthony of police officers assigned to the 11th District (the district of occurrence) and the City-wide Special Operations Section ("SOS") who were working on the date and time the alleged incident took place. During the photo array, Anthony identified Officer John Dahlberg of the 11th District and Officer Eugene Bikulcius of SOS as involved in the alleged incident. CPD records indicated, however, that on the date and time in question, Officer Dahlberg was on a leave of absence and Officer Bikulcius was detailed to a crowd control workshop not in the vicinity of Marshall High School.

In addition to conducting a photo array, OPS, as part of its own independent investigation, attempted to locate a contact card that, if in existence, would document the name of any Chicago police officer or officers who may have had contact with or encountered Anthony on January 26, 2006. The contact card would identify the name of any officers who interacted with him and would specify the nature of, and reason for, the contact.[3] On February 2 and again on February 21, 2006, City attorneys are aware that OPS conducted a Field Contact Inquiry, which consisted of searching the relevant data base for any contact cards dated January 26, 2006, involving a citizen with the last

---

[3] A description of the nature and use of contact cards by CPD, and of CPD's Contact Information System, is set out in CPD Special Order 03-09, a copy of which is attached hereto as Exhibit A.

3

name of "Thomas"and for any contact cards entered on that date for the 11th District.  On both occasions, the results of the search were negative.

In approximately mid-July 2006, written discovery between plaintiff and the City was exchanged.  Previously, pursuant to Rule 26(a)(1), the City attorneys produced the Complaint Register ("CR") file related to the incident, which included the documentation by OPS of the results of the photo array and, more importantly, the negative results of the Field Contact Inquiries which were performed on February 2 and 21, 2006.  In her answer to interrogatories served by the City, plaintiff indicated that the unknown officers were five white males wearing plainclothes.  Plaintiff also stated that three of the officers were in an unmarked vehicle with a license plate beginning with "M18."

For her part, plaintiff requested that the City produce "copies of the original contact cards generated at or near the vicinity of 134 N. Kedzie on January 26, 2006."  In full reliance on the negative results of the search for contact cards conducted by OPS, the City attorneys in response to plaintiff's request directed plaintiff to the relevant pages in the CR file that indicated that OPS had twice conducted such a search and that neither search disclosed the existence of any contact cards related to Anthony.  In further review of the City attorneys' case file, the City attorneys discovered that a request for contact cards related to the incident in the lawsuit had been made by a paralegal in IDL,[4] but did not find any contact card in their case file.  The City attorneys therefore concluded that a contact card did not exist, based on the multiple searches that failed to turn up any such card.

---

[4] City attorneys are aware that IDL routinely submits these requests immediately after receiving a copy of complaints alleging police misconduct.  In cases naming unknown officers, one of the purposes of submitting document requests to CPD is to assist with, and potentially expedite, the identification of individual officers.  These requests often are submitted before the City attorney assigned to the case even receives its own case file and a copy of the complaint.

As a direct result of the absence of a contact card or other paperwork documenting an encounter between Anthony and Chicago police officers on January 26, 2006, the City attorneys arranged for two photo arrays in addition to the array conducted by OPS.[5] On July 26, 2006, the first photo array was conducted.[6] Consistent with plaintiff's answers to interrogatories and the allegations of the complaint, the photo array included white and Hispanic male officers who work in plainclothes and were assigned to the 11th District and SOS on January 26, 2006. Anthony viewed over 300 photos (including photos of Officers Dahlberg and Bikulcius) but did not identify any officers as among those who allegedly had beaten him. On February 14, 2007, the City attorneys conducted a second photo array with Anthony. This array was expanded to include female officers, based on plaintiff's assertion for the first time that a female officer had been involved in the incident, and officers from the 13th District, which is geographically adjacent to the 11th District. Once again, Anthony did not identify any officers. On March 2, 2007, plaintiff amended her complaint to name as defendants Officers Dahlberg and Bikulcius.

On April 10, 2007, an attorney from the IDL division filed an appearance on behalf of the named officers. At no time, following the filing of this appearance, were the City attorneys notified that a contact card had been found or existed. It was not until five months later, on September 7, 2007, that City attorneys were notified for the first time that a contact card not only existed, but was

---

[5] In addition to the photo arrays, the City investigated the information provided by plaintiff regarding the license plate, and on September 20, 2006, informed plaintiff not only that no vehicle with a license plate beginning with "M18" had been assigned to respond to the fight at Marshall High School on January 26, 2006, but that no City vehicles at all are assigned a license plate number beginning with this alphanumeric prefix.

[6] This array began at 7:30 p.m., after the close of business for CPD and the City attorneys, in order to accommodate plaintiff's schedule.

5

in the possession of the IDL attorneys.[7]   Immediately upon learning of the existence of a contact card, the City attorneys asked the IDL attorney to view the contact card, but the card was not provided to them.

On September 10, 2007, IDL attorneys provided both plaintiff's counsel and the City attorneys a redacted copy of the contact card at issue in this case.[8]  The contact card, in redacted form, documented that on January 26, 2006, at 3:00 p.m. at 3058 West Madison Street, Officer Jason Brown had interviewed Anthony after Anthony was observed fleeing the scene of a gang fight.  The contact card also identified Michael Nunez as the approving supervisor.  The date the redacted contact card was produced to the City attorneys was the first time that they had ever seen the card after learning of its existence three days earlier.  To date, the City attorneys have not seen the original contact card, despite making additional requests.

As a direct result of the production of the contact card, the City attorneys began an investigation to determine why the contact card had not been previously located.  Although CPD Special Order 03-09 requires a police officer who prepares a contact card to submit completed contact information cards to a supervisor for approval before the end of his tour of duty, the City attorneys learned from CPD that the contact card in question had not been entered into the contact information database until February 24, 2006 – a date after OPS had searched this database in its attempt to determine whether a contact card existed related to the incident complained of by plaintiff.  The City attorneys also learned from CPD that the contact card in question had been retrieved from

---

[7] That same day, September 7, 2007, a second IDL attorney filed an appearance on behalf of the named officers.

[8] A copy of the contact card, as well as the accompanying cover letter, is attached hereto as Exhibit B.

the database on March 7, 2006, presumably pursuant to the February 22, 2006 request by the IDL

division paralegal and had been provided to IDL attorneys on March 9, 2006.

### Argument

I.  **This court should not sanction defendant City of Chicago for discovery violations because the City attorneys reasonably believed that the document in question did not exist and acted in good faith to assist plaintiff identify the unknown officers in this case.**

This court should not sanction defendant City of Chicago for a discovery violation because

the City attorneys, as that term is defined herein, reasonably believed that the document in question

did not exist and acted in good faith to help plaintiff identify the unknown officers in this case.  The

City attorneys knew at the outset of the litigation that OPS twice without success had attempted to

locate a contact card, as documented in the CR file that the City attorneys had obtained and

reviewed.  The City attorneys also knew that IDL had requested any and all contact cards related to

the case, and that IDL attorneys had not provided any contact cards to the City attorneys, or indicated

that they had received such documents.  Thus, it was reasonable for the City attorneys, relying on

the information contained in the CR file and the fact that IDL attorneys had not provided them with

any contact card, to believe that no such card existed.

The substantial efforts taken by the City attorneys to assist plaintiff in identifying the

unknown officers support the position that the City attorneys did not knowingly withhold

information as to the existence of the contact card, or the contact card itself, from plaintiff.  Contact

cards assist in identifying the police officers who encounter citizens.  If the City attorneys had known

of the existence of the contact card, or if they had the card in their possession or control, the City

attorneys would have produced the card.  Plaintiff then would have been able to amend her

complaint accordingly, and the litigation would have proceeded with some degree of confidence that

plaintiff had named as a defendant a police officer who had actually had contact with Anthony on

the date and time in question, independent of the merits of plaintiff's allegations.  Instead, the City

attorneys, in numerous different ways, tried to assist plaintiff in her effort to identify the unknown

officers.  These efforts included setting up two separate photo arrays (one of which was held after

the close of business) and investigating the possibility that these officers could be identified based

on a partial license plate number.  It makes no sense that the City attorneys, with the help of CPD,

would expend litigation resources in these endeavors if they could have been avoided by the

production of a single, two-page document.

Importantly, this court should consider the fact that, contrary to plaintiff's beliefs, it is in the

best interest of the City for individual officers to be identified.  Plaintiff has asserted state law claims

for which she seeks to hold the City liable on a *respondeat superior* theory.  Consequently, in the

event this matter proceeded to trial and a jury found that *any* Chicago police officer committed the

common law torts that plaintiff alleges,  the City may be held vicariously liable.  Thus, in order for

the City to defend against these claims, it is critical that it identify any police officer who may have

encountered or was in any way involved with plaintiff on January 26, 2006.  If it is unable to do so,

the City has no way to rebut plaintiff's claims, or to assess the value of the case.  Concealing from

plaintiff the identity of any unknown officers is contrary to the City's best interests in this litigation,

and this fact belies any allegation that the City attorneys may have attempted to do so by not

producing the contact card at issue to the plaintiff.

Accordingly, for all of these reasons, this court should find that defendant City of Chicago

did not engage in a discovery violation, and deny plaintiff's motion for sanctions against the City.

8

II.   **This court should not sanction defendant City of Chicago for the alleged discovery violation because plaintiff was not prejudiced by any delay in the production of the contact card in question.**

While it remains the City's position that the City attorneys are not responsible for any delay in the production to plaintiff of the contact card in question, the City does not deny that there was a delay between plaintiff's request for the document and her receipt of the document. While plaintiff asserts that she has spent numerous hours in efforts to identify the defendant officers and has had to rush against a statute to identify and name other defendant officers, in reality, she has suffered no prejudice from any delay in the production of the contact card. Thus, her assertion is not a basis for this court to grant her motion for sanctions.

Plaintiff's assertion that her time was wasted presumably refers to the photo arrays discussed above that were arranged by the City attorneys after her lawsuit was filed. Plaintiff alleges – then, as now – that five police officers physically abused her son. The contact card at issue, however, identifies only one police officer who encountered Anthony, and the other officer named on the contact card appears to have approved submission of the contact card after the fact. Thus, Anthony's participation in these photo arrays was a reasonable – even necessary – way for him to identify the four other officers whom he has sued. The fact that Anthony did not identify any additional officers at these arrays is not reason to conclude that these were futile exercises, or a waste of plaintiff's time. Moreover, in the only photo array during which Anthony identified any officers as potential defendants (the one conducted by OPS), the officers whom he selected, according to CPD records, could not have been at or near the location of the incident alleged in plaintiff's complaint. Although plaintiff has named Officer Dahlberg and Officer Bikulcius as defendants, it is reasonable to assume that on this basis they will be dismissed as defendants on a motion for summary judgment, or a jury

will find them not liable to plaintiff.  Thus, rather than suffering prejudice by having to participate in two additional photo arrays, plaintiff in fact received the benefit of two more opportunities for Anthony to identify police officers who more plausibly could have had some involvement with him on the date and time in question than Officers Dahlberg and Bikulcius.

In addition, plaintiff's assertion that she now has to "rush against a statute" as a basis to establish that she has been harmed by any delay in the production of the contact card is not persuasive.  Plaintiff has amended her complaint to include as defendants the officers identified on the contact card, Officer Brown and Officer Nunez, along with defendants Dahlberg and Bikulcius. Therefore, plaintiff was able to name the officers associated with the contact card well within the two-year statute of limitations governing her federal claims.[9]

While a court may impose sanctions against a party for failure to disclose information required by Rule 26(a) or 26(e)(1), such failure may be excused if it is harmless.  *See Armstrong v. Amstead Industries*, 2004 WL 1497779, at *3  (N.D.Ill. July 2, 2004) (defendants who failed to turn over key reports prior to the close of fact discovery not sanctioned).  In *Armstrong*, the plaintiff sought sanctions against both defendants for failure to produce reports.  In response, one of the defendants argued that it did not produce one of the reports because it was not in its possession, and the other defendant argued that its failure was the result of an inadvertent mistake by its treasurer to produce the report because he believed that the report had already been produced.  The court held that even though the defendants failed to produce documents that should have been produced,

---

[9]The City acknowledges that plaintiff is now time-barred from bringing any state law claims against newly-named defendants.  However, she still may pursue these claims against the City, as explained above.

sanctions were inappropriate because there was no evidence of bad faith, obstruction on the part of the defendants, or any harm demonstrated by the late production that could not be cured by a much less drastic remedy than sanctions.

The present case is analogous to *Armstrong*. As argued above, there is no evidence of bad faith or obstruction on the part of the City attorneys. Indeed, the City attorneys did not know about the existence of the contact card, had no reason to believe it existed, and did not have the card in its possession.[10] Furthermore, as in *Armstrong*, plaintiff cannot demonstrate that she has suffered any harm by the timing of the production of the contact card that cannot be cured. Accordingly, for these reasons, this court should deny plaintiff's Motion for Sanctions Against Defendant City of Chicago.

### Conclusion

For the reasons explained above, this court should deny plaintiff's Motion for Sanctions Against Defendant City of Chicago.

Respectfully Submitted,

MARA S. GEORGES
Corporation Counsel of the City of Chicago

By:   **/s/ Nathalina A. Hudson**
Assistant Corporation Counsel

**/s/ Megan McGrath**
Assistant Corporation Counsel

30 North LaSalle Street, Suite 1020
Chicago, Illinois 60602
(312) 744-9653/742-3541
Attorney Nos. 06275156/0628840

---

[10] The City attorneys do not presume to know why they were not notified of the existence of the contact card prior to September, 2007. Importantly, should the court determine the failure on the part of the IDL attorneys to produce the contact card was the result of an inadvertent mistake, under *Armstrong*, sanctions would be inappropriate.

11

# D.S.O.  03-09        Chicago Police Department

**TITLE:**                  **CONTACT INFORMATION SYSTEM**

**ISSUE DATE:**          **13 June 2003**

**EFFECTIVE DATE:**      **14 June 2003**

**DISTRIBUTION:**        **B**

**RESCINDS:**

## I.     PURPOSE

This directive:

A.     establishes the Contact Information System.

B.     discontinues the:

   *1.    Contact Information Card CPD-21.101 (Rev. 06/03),*

   *2.    Juvenile Contact Information Card CPD-21.102 (Rev. 06/03).*
(Item I-B revised, 29 December 2006, Department Special Order 03-09B.)

C.    *continues the use of:*

   1.    Contact Information Card CPD-21.101 (Rev. *08/06*),

   2.    Juvenile Contact Information Card CPD-21.102 (Rev. *08/06*).
(Item I-C revised, 29 December 2006, Department Special Order 03-09B.)

D.     delineates responsibilities and procedures for:

   1.    completing Contact Information Cards and Juvenile Contact Information Cards.

   2.    maintaining the contact information database.

   3.    accessing information from the contact information database.

**D.S.O.  03-09   CONTACT INFORMATION SYSTEM**
**ISSUE DATE:   13 June 2003**



II.   **GENERAL INFORMATION**

A.   The Contact Information System is an investigative tool consisting of two components: contact information cards completed in the field and a contact information database.

B.   Contact Information Cards

1.   Contact information cards provide a means for sworn members to document encounters with citizens that may serve a useful police purpose but do not otherwise require any written reports.

2.   Contact Information Cards, printed on white bond paper, will be completed for adult contacts; Juvenile Contact Information Cards, printed on yellow bond paper, will be completed for juvenile (under 17 years of age) contacts.

3.   The front side of the contact card contains general information concerning the contact and the circumstances of the contact.

4.   The reverse side of the contact card contains:

   a.   a narrative section entitled "Describe *Reasons* for Contact" used to describe the circumstances of the contact consistent with Item III of this directive.
   (Item II-B-4-a revised, 29 December 2006, Department Special Order 03-09B.)

   b.   a gang information section to be completed **only** if the sworn member preparing the card determines that the circumstances may involve **gang activity**.

5.   Retention

   a.   Pursuant to AMFN No. 03-5938, as of 01 January 2004, all completed contact information cards have been retained.

   b.   All completed contact information cards will be retained by the Record Services Division for a minimum of six months after the completion of the Traffic Stop Statistical Study.
   (Item II-B-5 revised, 10 July 2006, Department Special Order 03-09A.)

C.    Contact Information Database

1.    The contact information database, under the management of the Information Services Division (ISD), is a database that provides all sworn Department members with computerized access to contact information obtained in the field.

2.    ISD is responsible for the maintenance and integrity of the contact information database.

3.    Retention

a.    Pursuant to AMFN No. 03-5938, as of 01 January 2004, all information entered electronically into the database has been retained.

b.    Information will be retained electronically within the database for a minimum of six months after the completion of the Illinois Traffic Stop Statistical Study.

(Item II-C-3 revised, 10 July 2006, Department Special Order 03-09A.)

4.    The contact information database can be accessed by all sworn members via the CLEAR system.

## III.    CONTACT CATEGORIES

For the purposes of this directive, the following contact categories apply:

A.    **Citizen Encounter** – A voluntary interaction between a sworn member and a citizen that does not involve any suspicion of criminal activity. Citizen encounters can be initiated by either the citizen or the sworn member.

B.    **Investigatory Street Stop** – A contact in which the sworn member has articulable reasonable suspicion that the person is committing, is about to commit, or has committed a crime; consequently, the sworn member has momentarily restricted the person's freedom of movement. The contact should last only as long as necessary to determine if probable cause to arrest exists. Additionally, if the sworn member has reasonable articulable suspicion to believe that the person is armed with a weapon or dangerous instrument, the investigatory street stop may include a pat-down of the outer clothing for weapons consistent with the Department directive entitled "Interrogations: Field and Custodial."

## IV.    FIELD PROCEDURES

A.    Investigatory Street Stops

Field personnel who conduct an investigatory street stop that does not result in an arrest are required to complete the appropriate contact information card. *When completing a contact card, the officer will briefly and clearly explain the reasons in accordance with Item III-B of this directive, which lead the officer to make the contact.*

NOTE:    If, as a result of the investigatory stop, the sworn member ascertains there is probable cause to arrest and effects the arrest, a contact information card will not be completed and the circumstances of the stop and the probable cause for arrest will be documented on the Arrest Report (CPD-11.420 or *CPD-11.420-C*)and any required case report as necessary.

(Item IV-A revised, 29 December 2006, Department Special Order 03-09B.)

B.    Citizen Encounters

1.    A citizen encounter does not require the completion of a contact information card; however, field personnel will complete one if they believe it will serve a useful police purpose.

2.    Failure to provide identification during a voluntary citizen encounter, in and of itself, is not grounds for arrest or detention.

3.    A citizen encounter can develop into an investigatory street stop if the sworn member develops reasonable suspicion that a crime is taking place, is about to take place, or has taken place.

C.    If at the conclusion of an investigatory street stop, the citizen is unable or refuses to provide identification and there is no probable cause to arrest, the sworn member will:

1.    write "John Doe" or "Jane Doe," as appropriate, in the name field;

2.    complete as much of the card as possible;

3.    indicate the refusal in the narrative field; and

4.    describe the reason for the contact and/or the circumstances of the stop in as much detail as possible to include a description of any unusual clothing, manner, or behavior.

D.   Preparing sworn members will submit completed contact information cards to a supervisor for approval before the end of his or her tour of duty.

E.   Reviewing supervisors will:

1.   review both sides of the card to ensure it is properly completed and conforms to Department policy and procedures, *including Item III of this directive*;

(Item IV-E-1 revised, 29 December 2006, Department Special Order 03-09B.)

2.   indicate approval by signing the card in the appropriate field;

3.   forward the card to the on-duty desk sergeant.

F.   Desk sergeants

At the beginning of his or her tour of duty, each desk sergeant will forward all approved contact information cards, via the Police Document Services Section, to the Data Entry Section, Information Services Division (Unit 125).

## V.   EXTENDED HOLDS

A.   A member of the Bureau of Investigative Services may, with the approval of an exempt member, place a contact information card on "extended hold" for the purposes of safeguarding the original card related to an on-going criminal investigation or prosecution.  The request will be in the form of a To-From-Subject Report forwarded directly to the Manager, Records Services Division.

NOTE:   An extended hold will terminate six months from the date of approval unless an additional extended-hold request is approved and submitted.

B.   The Manager, Records Services Division, will ensure that an extended-hold file is maintained and purged consistent with Item VI-D of this directive.

## VI.   OTHER RESPONSIBILITIES

A.   The Director of ISD will ensure:

1.   all contact information cards received from the field are accurately entered into the database in a timely manner;

2.   improperly completed or deficient contact information cards are returned to the originating unit;

3.   once the information is entered, the contact information cards are forwarded to the Records Inquiry and Customer Services Section (Unit 163), Records Services Division, for records retention;

4.   gang-involved information listed on the contact information card that is related to a possible criminal street gang that is not currently in the verified table of criminal organizations is:

    a.   restricted from viewing by other than the assigned reviewing personnel from the Narcotics and Gang Investigation Section (NAGIS);

    b.   forwarded electronically to NAGIS for review;

    c.   once reviewed by NAGIS personnel either:

        (1)   removed from restricted access status as approved and verified information, or

        (2)   maintained under restricted access status as nonverified information until the record is purged.

5.   data is retained in the database for a minimum of six months after the completion of the Traffic Stop Statistical Study.
(Item VI-A-5 revised, 10 July 2006, Department Special Order 03-09A.)

B.   The Commander of NAGIS will ensure all gang-involved information forwarded and received electronically from ISD is reviewed by appropriate NAGIS personnel and is either verified and approved for dissemination or marked for continued restricted access and purging.

C.   Upon the return of improperly completed or deficient contact cards, unit commanding officers will ensure:

1.   the cards are properly completed and forwarded back to ISD;

2.   the member(s) completing the card and the supervisor approving the card  review the training video entitled "Contact Information System" and any other training tools approved by the Assistant Deputy Superintendent, Education and Training Division;

3.   the date and time of the sessions are entered into the members' computerized training records.

D.    The Manager, Record Services Division, will ensure:

    1.    all contact cards are retained, by month, for a minimum of six months after the completion of the Traffic Stop Statistical Study.
(Item VI-D-1 revised, 10 July 2006, Department Special Order 03-09A.)

    2.    all contact information cards approved for extended hold are placed in the separate extended-hold file and:

        a.    all cards on extended hold for over six months are removed from the file and destroyed unless an additional approved extended-hold request has been received;

        b.    periodically, but at least quarterly, a report is forwarded to the Deputy Superintendent, Bureau of Investigative Services, listing those contact information cards that have been placed on extended hold.

    3.    all Juvenile Field Contact Cards, including those on extended hold, are maintained separately from any contact information cards for adult subjects.

Authenticated by:

Terry G. Hillard
Superintendent of Police

03-080 DK(PMD)

# D.S.O.  03-09A        Chicago Police Department

| | |
|---|---|
| **TITLE:** | **CONTACT INFORMATION SYSTEM** |
| **ISSUE DATE:** | **10 July 2006** |
| **EFFECTIVE DATE:** | **11 July 2006** |
| **DISTRIBUTION:** | **B** |
| **RESCINDS:** | |

## I.    PURPOSE

This directive revises the retention schedule relative to the Contact Information System.

## II.     REVISIONS

A.     Item II-B-5 is revised to read:

     5.     Retention

         a.     Pursuant to AMFN No. 03-5938, as of 01 January 2004, all completed contact information cards have been retained.

         b.     All completed contact information cards will be retained by the Record Services Division for a minimum of six months after the completion of the Traffic Stop Statistical Study.

B.     Item II-C-3 is revised to read:

     3.     Retention

         a.     Pursuant to AMFN No. 03-5938, as of 01 January 2004, all information entered electronically into the database has been retained.

         b.     Information will be retained electronically within the database for a minimum of six months after the completion of the Illinois Traffic Stop Statistical Study.

C.     Item VI-A-5 is revised to read:

     5.     data is retained in the database for a minimum of six months after the completion of the Traffic Stop Statistical Study.

D.     Item VI-D-1 is revised to read:

     1.     all contact cards are retained, by month, for a minimum of six months after the completion of the Traffic Stop Statistical Study.

Authenticated by:

Philip J. Cline
Superintendent of Police

06-064 DK(PMD)

# D.S.O.  03-09B     **Chicago Police Department**

TITLE:               **CONTACT INFORMATION SYSTEM**

**ISSUE DATE:**          **29 December 2006**

**EFFECTIVE DATE:**      **01 January 2007**

**DISTRIBUTION:**        **A**

**RESCINDS:**

I.    **PURPOSE**

The purpose of this revision is to comply with changes in the Contact Information System.

II.   **REVISION**

    A.    Item I-B is revised to read:

        B.    discontinues the:

            1.    *Contact Information Card CPD-21.101 (Rev. 06/03),*

            2.    *Juvenile Contact Information Card CPD-21.102 (Rev. 06/03).*

    B.    Item I-C is revised to read:

        C.    *continues the use of:*

            1.    Contact Information Card CPD-21.101 (Rev. *08/06*),

            2.    Juvenile Contact Information Card CPD-21.102 (Rev. *08/06*).

    C.    Item II-B-4-a is revised to read:

        a.    a narrative section entitled "Describe *Reasons* for Contact" used to describe the circumstances of the contact consistent with Item III of this directive.

    D.    Item IV-A is revised to read:

        A.    Investigatory Street Stops

            Field personnel who conduct an investigatory street stop that does not result in an arrest are required to complete the appropriate contact

information card. *When completing a contact card, the officer will briefly and clearly explain the reasons in accordance with Item III-B of this directive, which lead the officer to make the contact.*

NOTE:    If, as a result of the investigatory stop, the sworn member ascertains there is probable cause to arrest and effects the arrest, a contact information card will not be completed and the circumstances of the stop and the probable cause for arrest will be documented on the Arrest Report (CPD-11.420 or *CPD-11.420-C*)and any required case report as necessary.

E.    Item IV-E-1 is revised to read:

   1.    review both sides of the card to ensure it is properly completed and conforms to Department policy and procedures, *including Item III of this directive*;

Authenticated by:

Philip J. Cline
Superintendent of Police

New or revised material is indicated in *italics*.
06-222 MAV(PMD)



**City of Chicago**
**Richard M. Daley, Mayor**

**Department of Law**

Mara S. Georges
Corporation Counsel

Individual Defense Litigation
Suite 1400
30 North LaSalle Street
Chicago, Illinois 60602-2580
(312) 742-6433
(312) 744-6566 (FAX)
(312) 744-9104 (TTY)
http://www.cityofchicago.org

<u>**Via Facsimile & U.S. Mail**</u>


September 10, 2007


Ms. Angela Lockett
Law Office of Standish E. Willis
407 S. Dearborn Street
Suite 1395
Chicago, IL  60605.

     Re:   <u>Thomas v. City of Chicago, et al.</u>, 06 C 757

Dear Counsel:

     Enclosed with this letter please find a copy of contact card information for Anthony Thomas, on January 26, 2006.  Thank you for your attention to this matter.

     Sincerely,

     *Anne K. Preston*

     Anne K. Preston
     Assistant Corporation Counsel
     (312) 742-4045

cc: Nathalina Hudson





EXHIBIT

B



# CLEAR Data Warehouse
# Contact Information Card Sea
# Search

Card No = 871818
Report Date= 3/7/06          Requested By= pc███████

## Contact Details

Card No. 871818     Contact Date/Time 26-JAN-2006 15:00          Submitting Beat 6540B          Juvenile Y
Contact Type Gang / Narcotics Related

Street No. 3058   Street Dir. W   Street Name MADISON ST   Apt/Suite
City CHICAGO   State IL   Zip 60612          Beat 1331

## Person Details

Last Name THOMAS     First Name ANTHONY          Middle Initial          Name Suffix
Nickname          Birth Date 27-AUG-1992     Age 13     Age To
Sex M     Race BLK     Height 504
Weight 110     Build MED          Eye Color BRO
Hair Color BLK     Hair Style AFRO     Complexion MED
Phone No.     Cell No.
Clothing Description

## Residential Address

Street No. 121   Street Dir. N   Street Name FRANCISCO AVE   Apt/Suite
City CHICAGO   State IL   Zip 60612   Beat 1331

## Employer/School Details

Employer Business Name   School Name

Street No.   Street Dir.   Street Name   Apt/Suite
City   State   Zip   Beat

## Vehicle Details

License No.   License Type
License State   License Expiration   VIN No.

Vehicle Year
Vehicle Make
Vehicle Model   Type
Body Style   Color

## ID Details

Name Verified? N   Drivers License No.   State   SSN
Other ID Type   Other ID No.   RD No.
OCD-I No.   Hotspot No.   Event No.   Mission No.

Contact Details

## Gang Details

NAGIS Verified? N
Gang Name GANGSTER DISCIPLES   Faction Name
Known Hang-Outs
Type of Gang Activity    Other Activity

## Scar Marks

/ / /

## Reason for Contact

ABOVE SUBJECT OBSERVED FLEING STREET DIST.,/GANG FIGHT. SUBJECT THRU AS HE RAN FROM SCIENCE AND WAS INTERVIEWED. SUBJECT STATED FIGHT INVOLVED 4 GANGS.

## Employee Details

1st Preparing Officer: Star No. 14562   Employee No. ███   Last Name BROWN   First Name JASON
2nd Preparing Officer: Star No.   Employee No.   Last Name   First Name
Approving Supervisor: Star No. 2056   Employee No. ███   Last Name NUNEZ   First Name MICHAEL